HAROLD EDWARD GRAY, Plaintiff-Respondent, v. ST. LOUIS-SAN FRANCISCO RAILWAY COMPANY, a Corporation, Defendant-Appellant, No. 42943—254 S. W. (2d) 577.

Division One, December 8, 1952.

Motion for Rehearing or to Transfer to Banc Overruled and Opinion Modified on Court's Own Motion, February 9, 1953.

*E. G. Nahler, Frank C. Mann, C. Wallace Walter* and *Mann, Mann, Walter & Powell* for appellant.

*Theodore Beezley, Orville Kerr* and *Wayne W. Slankard* for respondent.

COIL, C.—Harold E. Gray, plaintiff-respondent, was found on the right of way of the St. Louis-San Francisco Railway Company near Fordland, Missouri, on August 3, 1950. He was removed to O'Reilly Veterans' Administration Hospital in Springfield. He brought an action against defendant-appellant Railway for $100,000 actual and $25,000 punitive damages. The jury returned a verdict for defendant-appellant. The trial court granted a new trial for the assigned reason that it erred in excluding the O'Reilly Hospital record pertaining to respondent. The Railway appealed from the order granting the new trial.

Plaintiff's evidence tended to show that he left West Plains about 11:30 p.m., July 31, 1950, as a trespasser on defendant's passenger train No. 106; that he first took a position on the exterior of the train between the diesel locomotive and the next car; that at the train's first stop he entered an open car (not a passenger car); that when the train again stopped, defendant's brakeman entered the car and, after some conversation as to payment of fare, assaulted plaintiff and pushed or knocked him from the fast-moving train; that this was sometime in the early morning of August 1, 1950; that plaintiff's next recollection was some days later when in the hospital.

Defendant's evidence tended to show that its agents, servants, and employees had no knowledge of the presence of plaintiff on, and that no brakeman or other employee ejected plaintiff from, any of defendant's trains, including 106.

Defendant contends that the court erred in granting a new trial on the assigned ground, and that there was no other error committed by the trial court which entitled plaintiff to a new trial.

Plaintiff contends that the court correctly granted a new trial on the assigned ground, and further that he was entitled to a new trial on the additional grounds that the trial court erred in rejection of other evidence, in permitting prejudicial cross-examination, and in the giving of instruction 4.

Plaintiff's witness Schneider testified that he was the registrar at O'Reilly Veterans' Administration Hospital and had control of the hospital and clinical records, and that it was his duty to keep those records. He produced a record which he identified as that pertaining to the care, treatment, and examination of plaintiff at O'Reilly Hospital and stated that he was official custodian of the record. The record was offered in evidence as plaintiff's Exhibit 2. The following objection was made by defendant's counsel: "We object to the offer because it is self-serving and hearsay. It's not any record required to be kept by law and not admissible on that ground; not binding upon the defendant and couldn't possibly bind this defendant, and the offered exhibit contains history which is a mere recitation of self-serving statements and hearsay, which couldn't be binding upon this defendant." This objection was sustained. Plaintiff made no further offer at the time of any separate parts of the exhibit. Later, plaintiff's witness, Dr. Gillespy, chief surgeon at O'Reilly Hospital, identified a part of Exhibit 2 as being "doctor's progress notes" in his handwriting. Apparently this portion of Exhibit 2 was, at the trial, physically detached from Exhibit 2, marked Exhibit 3, and offered and received in evidence. Dr. Gillespy also identified another part of Exhibit 2 as a laboratory report disclosing the color, cell count, and differential of plaintiff's spinal fluid as a result of a test made on August [579] 4, 1950. This part was also detached, marked Exhibit 4, and received in evidence.

Plaintiff made no further effort to offer any other portion of Exhibit 2. (It appears that entire Exhibit 2 as originally offered is not here. It would seem that there were apparently other "doctor's progress notes" forming a part of the exhibit as originally offered. These were apparently removed when the parts marked Exhibit 3 were removed, and were not reattached to Exhibit 2.)

Defendant urges that we need not determine whether the trial court erred in excluding the hospital record as a whole because the only entry, if any, which could possibly pertain to liability as opposed to the issue of damages was one which was also included in Exhibit 3, and this latter exhibit was in evidence. Defendant contends that the verdict demonstrates that the jury did not consider the nature and extent of plaintiff's injuries.

The entry in Exhibit 2 to which defendant refers is: "This 31-year old white male was admitted to this hospital August 3, 1950, direct. Story from wife of patient was that the patient left West Plains, Missouri at 8:00 p.m. Monday July 31, 1950 and was found

along railroad tracks at 11:00 a.m. August 3, 1950 the following Thursday. The presumption is that he either fell or was pushed off a freight train and sustained skull fracture. From the sunburn that the patient had it was believed he laid on his back for approximately three days. The dehydration helped his fracture and the cool weather kept him from dying of sunstroke. No liquor ordor noted.'' It is true as defendant says that the information contained in the quoted portion of Exhibit 2 was contained also in Exhibit 3. Exhibit 3, we repeat, was admitted in evidence over defendant's objection.· Were this, as defendant contends, the only entry in Exhibit 2 possibly pertaining to liability, defendant's contention would be well taken. But at least one other entry appears in Exhibit 2 and not in Exhibits 3 or 4. This: ''Mouth: Teeth loose (lower central).'' There was evidence that defendant's brakeman kicked plaintiff under the chin and struck him on the head with a blunt instrument during the process of forcing plaintiff from the moving train. We may not say that, if it were shown by competent evidence that when plaintiff was admitted to the hospital his lower central teeth were loose, such would not be some evidence of probative value corroborating plaintiff's account of how he was injured and thus some evidence for the jury on liability.

We must, therefore, determine whether the trial court erred in sustaining defendant's objection to Exhibit 2, thereby excluding portions of the hospital record which might have had some bearing on liability, which portions were not included in Exhibits 3 and 4.

Prior to the repeal in 1947 of Art. 2, Chap. 57, RSMo 1939, and the enactment in lieu thereof of sections which are presently RSMo 1949, §§ 193.010-193.380, V.A.M.S., the admissibility of hospital records depended upon whether the particular record was within the provisions of Section 9777, RSMo 1939. That is to say, admissibility depended upon whether the particular record offered contained facts which were required by law to be kept. RSMo 1949, § 193.270, V.A.M.S., provides in part that ''Persons in charge of institutions for * * * treatment of disease, * * * shall record and report all statistical data required by this law relating to their * * * patients.'' Nothing in the law, of which Section 193.270 is a part, requires the recordation as statistical data of most of the information contained in the usual hospital record, and certainly not information of the kind with which we are here concerned.

The Uniform Business Records as Evidence Law, RSMo 1949, §§ 490.660-490.690, V.A.M.S., applies to and affects the admissibility of hospital records. Melton v. St. Louis Public Service Co., 363 Mo. 474, 251 S.W. 2d 663. Section 490.680 of that Act provides: ''A record of an act, condition or event, shall, insofar as relevant, be competent evidence if the custodian or other qualified witness testifies to its identity and the mode of its preparation, and if it

was made in the regular course of business, at or near the time of the act, condition or event, and if, in the opinion of the court, the sources of information, method [580] and time of preparation were such as to justify its admission.'' In construing this section, we have held that: ''When the record entry is not of such a character as to give it the status of a *business* entry, the entry is relegated to the status of hearsay and is inadmissible under the hearsay rule.'' Melton v. St. Louis Public Service Co., supra, 251 S.W. 2d 669.

The first page of plaintiff's Exhibit 2 which contains the entry mentioned, ''Mouth: Teeth loose (lower central)'', is headed ''Clinical Record, Narrative Summary''. It was dated August 17, 1950, and signed by the chief surgeon, Dr. Gillespy. An examination of this ''Narrative Summary'' makes it apparent that it is a compilation and summary of various record entries which should appear as original entries in other portions of the hospital record. Plaintiff was admitted to O'Reilly Hospital on August 3, 1950, and transferred to another veterans' hospital on August 18, 1950. Obviously, a ''physical examination on admission'' was not made on August 17, 1950. But the ''physical examination on admission'' does not appear in any other part of Exhibit 2 as an entry or a series of entries purportedly made at the time of the admission of the plaintiff to the hospital. It appears in Exhibit 2 only as part of a ''narrative summary'' dated August 17, 1950.

The section of the ''Business Records Act'' heretofore quoted provides that, precedent to the admission in evidence of an offered record, a qualified witness shall not only identify the record but that he shall also testify to the mode of its preparation, and that it must appear that the record in question was made in the regular course of business, at or near the time of the act, condition or event purportedly recorded. It is apparent that there was no identification of, or testimony concerning, the record in question necessary to give it the status of a *business* entry within the meaning of the Act. And the fact that the entry in question was a part of a ''narrative summary'' apparently prepared from other data (not a part of the exhibit) negatives the idea that the entry was in fact a business entry. The only identification of Exhibit 2 was that the exhibit was the original hospital record ''regarding the care, treatment, and examination'' of plaintiff from August 3, 1950 to August 17, 1950; and that the record was under the care of the witness as official custodian. No showing was made that the exhibit was a record of acts, conditions or events ''made in the regular course of business, at or near the time of the act, condition or event.'' No testimony was offered to show the ''mode of its preparation.'' The record entries were therefore not shown to be business entries and were hearsay and inadmissible. Melton v. St. Louis Public Service Co., supra. Defendant did not, as in the Melton case, waive objection to the reliability

of the record and confine its objection to only designated portions of the record on the grounds that only such portions were hearsay and self-serving. Instant defendant's objection was that the entire record was hearsay. The objection was a valid one because, as we have pointed out, the entire hospital record was hearsay and admissible only if made so by the Business Records Act. Consequently, the trial court did not err in sustaining defendant's objection to the entire record, Exhibit 2. It follows that the trial court erred in granting plaintiff a new trial on the assigned ground that there was error in excluding the O'Reilly Hospital record.

But, plaintiff says, the granting of the new trial was a matter within the sound discretion of the trial court; that the exercise of that discretion was reasonable and should not be interfered with on appeal. A trial court may exercise its discretion in determining the prejudicial effect resulting from erroneously admitting or excluding evidence. But this discretion exists only if the trial court erred in the admission or exclusion of the particular evidence. That is to say, if there was no error committed in excluding or admitting proffered evidence, the trial court had no discretion to grant a new trial. In the instant case, whether the hospital record was admissible was a question of law. There is no discretion as to matters of law. Mavrakos v. Mavrakos Candy Co., 359 Mo. 649, 657[2], 223 S.W. 2d 383, 386[2-7].

Our conclusion as to the admissibility of the hospital record makes it unnecessary to rule further contentions of the parties pertaining to that record. We should make clear, however, that we do not mean to imply that there may not be other valid reasons for excluding portions of the hospital record, even though it may have contained many parts or portions which, upon proper identification and proper testimony concerning them, may have been admissible under the Business Records Act.

Plaintiff urges that he was entitled to a new trial for reasons not assigned by the trial court. He contends that the trial court erred in permitting cross-examination of plaintiff concerning his alleged arrests and convictions in the "police court", and in permitting the disclosure by such cross-examination that plaintiff had "been in jail or picked up by the police". Plaintiff cites cases to the effect that it is error to permit either a showing that one has been charged with a crime without showing a conviction for that crime, or cross-examination as to whether one has been convicted in police court for violation of a city ordinance, or has pleaded guilty to the violation of a city ordinance. State v. Menz, 341 Mo. 74, 90[6], 106 S.W. 2d 440, 448[5,6]; Meredith v. Whillock, 173 Mo. App. 542, 554, 158 S.W. 1061, 1065; Stokes v. Wabash R. Co., 355 Mo. 602, 610, 197 S.W. 2d 304, 308.

The difficulty with plaintiff's position is that the law of these cases is not applicable under the circumstances of the instant case. Plaintiff was asked on *direct* examination: "Q. Have you been in some 'scrapes' at West Plains? A. Just little. Q. What for? A. Fighting and maybe drinking or something like that, but nothing, no criminal or nothing like that. Mr. Mann: We ask that be stricken. The Court: Sustained. A. Fighting or little— Q. Where was that? A. West Plains. Q. What Court? Do you know? A. City Court, you know." (Apparently the motion to strike and the ruling thereon was understood to apply to the portion of the answer, "no criminal or nothing like that".)

On cross-examination the following questions, objections, and answers appear: "Q. * * * Now you say you have been in some 'scrapes' as your attorney says? Good many of them, West Plains and other places, haven't you? A. Yeah. Q. Let's review those. Back in 1938 you were arrested down at Poplar Bluff, Missouri, weren't you?

"Mr. Slankard: That's improper cross-examination. The Court: Overruled. You went into it in your opening statement. Mr. Mann: You went into it. The Court: Overruled.

"Q. You were down at Poplar Bluff and arrested and held for investigation back in '38? A. No, sir. Q. You don't remember about that? A. No, sir. Q. Then August 27, 1948, you paid a $5 fine or two days in jail as a tramp in Des Moines, Iowa? Mr. Slankard: I make the same objection. The Court: Sustained. You can't try what it was for. That would be another lawsuit. Q. I will ask you if you paid a $5 fine in Des Moines, Iowa, in August, 1948? Mr. Slankard: I object to that because there is no showing that the question applies to any offense other than conviction in some city court, and such conviction is not admissible. The Court: Sustained. Mr. Mann: They went into that matter. The Court: They said he was in several 'scrapes' and they are objecting now to this particular question, and I think it's a proper objection.

"Q. When you testified in answer to your attorney's question that you had been in several 'scrapes' down there in trouble at West Plains, what did you refer to? What were you convicted of down there? A. Just drinking. Q. Drinking? A. Yes, sir. Q. And fighting? A. Yeah. Q. Then you were convicted again for leaving the scene of an accident?

"Mr. Beezley: I object to that. He hasn't laid the proper foundation and talking [582] about something here which is obviously a city case. Where was it? The Court: Overruled.

"Q. Were you convicted and paid a fine for leaving the scene of an accident? A. Yes, sir. Q. When was that? A. I believe it was October, I am not sure. Q. What year? A. Last year. Q. What? A. Last year, I believe. Q. Since this accident occurred? A. Huh?

Q. Since this accident occurred? A. How long? Q. It was since this accident occurred? A. What was since? Q. That you were convicted of leaving the scene of an accident. A. Yes, sir.

"Mr. Beezley: The thing I am objecting to, he is not saying in what court it was or where it was, asking general questions. The Court: That will be sustained.

"Q. Were you convicted in Howell County in Circuit Court there for resisting an officer and paid a $50 fine? A. I believe I was. Q. When was that? A. I can't remember. I don't know just when it was. Q. That's in December, 1946? A. It could have been, yes. I believe it was in December."

It thus appears that plaintiff's counsel for one reason or another chose to bring out on direct examination that his client had been in some "scrapes"; and chose to develop that at least one of the scrapes was connected in some manner with the City Court at West Plains. On cross-examination defendant's counsel established without objection that these "scrapes" which were referred to on direct had been more numerous and widespread geographically than plaintiff had indicated. Defendant's counsel then inquired about a 1938 arrest in Poplar Bluff which defendant denied after the court had overruled the objection "That's improper cross-examination." Plaintiff was asked whether he had not paid a fine or spent some time in jail as a tramp in Des Moines, Iowa. The court sustained an objection to this question and, in doing so, suggested that cross-examination concerning the "scrapes" in which plaintiff said he had engaged did not justify particular questions regarding those "scrapes." No further action of the trial court was asked. Counsel for defendant then specifically inquired what plaintiff meant when he answered on direct examination that he had been in "scrapes" in West Plains; plaintiff answered that he meant drinking and fighting. Thereafter, plaintiff, in answer to questions over an objection of his counsel, admitted he had been convicted of leaving the scene of an accident in October before the instant trial. When counsel for plaintiff made a further objection on the ground that it was not established in what court the conviction occurred, the court sustained his objection. No further action was requested of the trial court. Plaintiff then admitted that he had been convicted in the Circuit Court of Howell County for resisting an officer, probably in December 1946.

Upon such a record, plaintiff is in no position to complain of the cross-examination. Plaintiff introduced the subject of his "scrapes" in West Plains which apparently did not involve other than prosecutions or convictions in a City Court; and presumably for violations of city ordinances. Inasmuch as plaintiff introduced the subject of "scrapes" and answered, without objection, that he had been in "scrapes" in places other than West Plains, we think counsel for defendant could properly develop how frequently, and in what other

localities, "scrapes" had occurred. Plaintiff chose to tell the jury, in effect, that the only trouble he had theretofore encountered was in connection with drinking and fighting in West Plains. Now, while it would have been improper to permit defendant to show other than "convictions" of crimes for the purpose of affecting the credibility of plaintiff in the sense that "conviction of a crime" affects credibility, nevertheless, the effort here was to affect plaintiff's credibility by showing that there were other "scrapes" which plaintiff had not related on direct examination. We are of the opinion that the cross-examination, **[583]** as limited by the trial court, did not certainly go beyond the scope of cross-examination invited by plaintiff.

■ Instruction 4, given at defendant's request, was: "The Court instructs the jury that if you find and believe from the evidence that there was but one brakeman on train No. 106 on the night in question, and that said train on said night consisted of fifteen cars, in addition to the engine, and if you shall further find that when the train stopped at Willow Springs, Missouri, if you so find, said brakeman remained at the rear of the train, and that upon leaving Willow Springs said brakeman rode on the rear car of said train, and that he, at no time, went toward the front of said train, or got in one of the baggage cars or mail cars of said train, then your verdict should be for the defendant and this is true without regard to any other issue in the case." Plaintiff insists that this instruction was erroneous in that it failed to hypothesize certain facts in evidence. The point, as presented in plaintiff's argument, is this: that defendant's evidence showed that the train made three stops, one at West Plains (where plaintiff boarded), one at Willow Springs, and one at Mountain Grove; the instruction mentioned only the Willow Springs stop; the instruction does not require a direct finding that defendant's brakeman did not "see or assault" plaintiff.

Defendant did not need to hypothesize all the facts which its evidence may have supported, or to require a direct finding that defendant's brakeman did not "see or assault" plaintiff. The instruction would have been clearer and a better one if it had required a finding that defendant's brakeman did not assault plaintiff and thereby cause him to fall from the train. But if defendant's instruction "hypothesized facts which if true destroyed plaintiff's case on the factual theories plaintiff pleaded and submitted", the instruction was not prejudicial to plaintiff.

Plaintiff does not attack the instruction on the ground that it assumes that Willow Springs was the first stop after West Plains. Defendant's evidence was that Willow Springs was the first stop, and plaintiff once stated that he thought the first stop the train made was at Willow Springs. Plaintiff apparently concedes that there was and is no controversy that Willow Springs was in fact the first stop after West Plains. It was plaintiff's submitted theory that defendant's

brakeman entered the car occupied by plaintiff (which was toward the front of the 15-car train) at the second stop after the train left West Plains, and thereafter assaulted him and caused him to fall from the moving train. Thus, if, under instruction 4, the jury found that defendant's brakeman did not go toward the front of the train, either while the train was stopped at Willow Springs or after the train left Willow Springs, but that the brakeman thereafter rode the rear car of said train, the jury necessarily found facts which precluded a recovery by plaintiff on his claim as submitted in his instruction 1.

But plaintiff also contends that there was no evidence to support these hypotheses in instruction 4: that the brakeman remained at the rear of the train when it stopped at Willow Springs; that the brakeman, after leaving Willow Springs, rode the rear car; and that the brakeman "at no time, went toward the front of said train, or got in one of the baggage cars or mail cars of said train".

The evidence supporting these hypotheses is not as apparent or direct as it probably could have been by more direct questions to the brakeman. However, a review of the testimony of various witnesses convinces us that there was sufficient evidence to support each of the hypotheses contained in the instruction. That is to say, there was enough evidence from which the jury could reasonably find each of the essential hypothesized facts.

The brakeman testified that he was the only brakeman on train 106; that he rode on the very rear end of the train; that his duty was to protect the rear end of the train; that a passenger-train brakeman has no duty toward the front end of the train and violates instructions if he attends to any other duty than at the rear of the train; that when a train comes to a stop at night, the rule is that the brakeman must get on the ground with two lanterns [584] ready to go backward when called; that he did not see any trespasser on train 106 at the time in question; that he did not find a trespasser in a baggage car on the train; that he had never put any "bum or tramp" off that train; and that he had never seen plaintiff prior to the time plaintiff's deposition in the instant case was taken.

One of respondent's witnesses testified on cross-examination that a brakeman on a passenger train never leaves the rear end of the train except on orders from the conductor. The conductor in charge of train 106 testified that the brakeman has no business leaving the rear end of the train.

The evidence further showed that there were six cars other than passenger cars in the 15-car train. The first car behind the locomotive was a sealed express car, the second was a storage mail car, the third was a railroad postoffice and baggage car, the next was a mail car,

the next a baggage, mail, and express car, and the sixth was a "straight express" car. Plaintiff's testimony was that the car he occupied was not farther from the locomotive than the sixth car. As noted, defendant's evidence showed that the first six cars were baggage or mail cars, and plaintiff's testimony concerning the car in which he was riding was such that from it a jury could reasonably conclude that it was some type of baggage car.

We think the jury could reasonably conclude from all the testimony that the only brakeman on train 106 did not at any time go toward the front of the train or get into one of the baggage or mail cars. Consequently, whatever else may be said about the instruction, if the jury found that the only brakeman did not go toward the front end of the train and did not get in a baggage or mail car, then plaintiff was not entitled to recover on his claim as submitted by his instruction 1.

Plaintiff also contends that the instruction is confusing and misleading because it "led the jury to believe that the brakeman had no opportunity to go forward or that he never went forward, and there isn't any evidence in this record to this effect;". What we have said heretofore disposes of the contention as to lack of evidence to support the instruction. The instruction required the jury to find that the brakeman *did not go* toward the front end of the train; we see no basis for the contention that the instruction would lead the jury to believe that the brakeman had *no opportunity to go* forward.

While we do not recommend an instruction, such as No. 4, which submits findings based largely upon circumstantial evidence to negative plaintiff's right to recover, rather than submitting a direct finding on the simple issue involved, nevertheless, we may not say that the instruction was prejudicial under the facts of this case.

Plaintiff says that the trial court erred in excluding a photograph of plaintiff in military uniform taken in 1943, some seven years prior to the accident in question. The photograph was offered to prove that prior to the accident plaintiff did not have the facial scars he had at the time of trial. Generally speaking, the admission or exclusion of photographs is within the discretion of the trial court. Boulos v. Kansas City Public Service Co., 359 Mo. 763, 773, 223 S.W. 2d 446, 452[7-9]. In this case, we need not concern ourselves with the proffered photograph in so far as it may have had the effect of demonstrating plaintiff's appearance or state of health prior to the accident. This, because the jury did not reach the issue of the nature and extent of plaintiff's injuries. Assuming, however, that the location of some of plaintiff's scars may have been some evidence supporting plaintiff's theory of how he was injured, and assuming further that the photograph may have been some evidence indirectly supporting plaintiff's theory in that it tended to show that the scars were a result of the alleged assault, still, even on this tenuous theory, plaintiff established

878

the latter by far more direct and probatively valuable testimony.

Plaintiff testified about, and specifically indicated to the jury, the facial scars he sustained as a result of the accident. Plaintiff's wife described the scars and said that plaintiff had none of them prior to the alleged assault. The photograph would have added nothing of value to such direct **[585]** testimony in so far as the issue of liability was concerned. The trial court did not abuse its discretion in excluding the photograph.

Plaintiff contends that the trial court erred in excluding the testimony of Dr. Gillespy as to plaintiff's complaints on admission to the hospital. Plaintiff urges that a doctor may testify as to present complaints made by a patient at the time of examination. Cruce v. Gulf, Mobile & Ohio R. Co., 361 Mo. 1138, 1147[5], 238 S.W. 2d 674, 679 [10, 11]. In the instant case it affirmatively appears, however, that plaintiff was not prejudiced by the refusal of the trial court to permit the doctor to answer the question calling for the complaints plaintiff made when admitted to the hospital. First, because Dr. Gillespy testified that plaintiff was unconscious when admitted and was incoherent during his entire stay. Second, because the doctor testified to his findings on examination of plaintiff on admission. In view of such testimony, a recounting of complaints made would add nothing of value on the issue of liability.

The order granting plaintiff a new trial is reversed and the case remanded with directions to enter judgment for defendant. *Van Osdol* and *Lozier, CC.,* concur.

PER CURIAM:—The foregoing opinion by Coil, C., is adopted as the opinion of the court. All the judges concur.