CONRAD LANG, (Plaintiff) Respondent, v. ST. LOUIS-SAN FRANCISCO RAILWAY COMPANY, a Corporation, (Defendant) Appellant, No. 44013—273 S. W. (2d) 270.

Division Two, November 8, 1954.

Motion for Rehearing or to Transfer to Banc Overruled, December 13, 1954.

*James L. Homire, C. H. Skinker,* and *Ernest D. Grinnell, Jr.,* for appellant.

1150

*Correnti, McKee & Rosenblum* and *Richard D. Fitzgibbon, Jr.,* for respondent.

BARRETT, C.—On October 2, 1951, about eight o'clock in the evening, the plaintiff, Conrad Lang, was struck by the Frisco's westbound passenger train, the "Meteor," as he walked across the railroad's tracks at Fourth and Pacific Streets in Pacific. To recover damages for his resulting personal injuries Mr. Lang instituted this action against the railroad, and he has recovered a judgment for $18,359.00. His right to recover was submitted upon the hypothesis that the railroad was negligent in that as he walked across the tracks he was oblivious of the train's approach, came into a position of imminent peril and danger of being struck by the train, that the engineer saw or should have seen him, realized that he was oblivious and in peril, and, thereafter, by the exercise of ordinary care "could have slackened the speed of his said train and stopped the same" and thereby have avoided hitting him.

At the time of his injury Mr. Lang was sixty-seven years of age and had a cataract over his left eye. He had worked for a dairy for five years, feeding cattle, cleaning the barn, and doing general farm work, at a salary of twelve dollars a week. He lived in his own home with his sister-in-law on Pacific Street, a short distance from the crossing. He was uneducated, had gone as far as the third or fourth grade in school. One of the doctors, in describing Mr. Lang when he first saw him on October 9th, said that he was negativistic, uncooperative, didn't want to talk and "was sort of a sour apple to deal with." He had lived in the neighborhood of the crossing for years but was unable to give much information of value as to the facts of the occurrence. He came home from work, ate supper and sometime near eight o'clock "turned around and went to go back down, you know, to get some tobacco, and that is when I got hit there." Pacific is an east and west street and he walked down the south side of the street to Fourth Street and the tracks, crossed to the north side of Pacific and proceeded east across Fourth Street and the walkway over the tracks. There were the usual "cross-buck" warning signs and an overhead street light at the crossing. He heard no signals, saw no lights and did not look to the north or east as he crossed the tracks and did not see or hear the oncoming train. Whether counsel's questions, his own or the railroad's counsel, related to distances or places, he insisted on repeating that he was struck on the last or fourth track, "when I was just getting ready to get off this last rail." Often he simply did not answer the questions. But he was struck on his left side, the engineer said, by "the left side of the pilot" or engine, and knocked off the track to the east, four to six feet east of the crossing.

While it is said that the "Meteor" was a westbound train the fact

of the matter is that Fourth Street is a north and south street and Pacific is an east and west street, and they intersect at right angles. The railroad tracks enter Pacific from the northeast and pass through this street intersection from the northeast on a long, sweeping curve ("2500 foot radius") to the southwest. There are four sets of tracks in the intersection, the fourth or easternmost track being the main line track upon which Mr. Lang was struck. Available accurate data, distances, and measurements are not given, but the distance between the rails on each set of tracks, as is well known, is four feet eight and one half inches. The railroad does not question the plaintiff's evidence that the easternmost track is 15.3 feet from the next track to the west, and that track, in turn, is 16 feet from the next track, which in its turn is 13.3 feet from the westernmost track. Likewise, it is not disputed that the distance from the second or outside rail of the easternmost track across the walkway to the second or inside rail of the westernmost track is forty-two feet five inches. From the first rail of the second set of tracks to the outside rail of the easternmost set of tracks the distance is twenty-nine feet.

The "Meteor" was a thirteen-car train with a two-unit Diesel locomotive. The train was traveling at a speed of twenty-five miles an hour as it entered the city limits with the bell ringing and its two headlights, one a stationary light, the other an automatic oscillating light, burning, and from his position in the right side of the cab the engineer could see "about ninety degrees to the left." The engineer had used the air brakes before reaching Pacific and they were in good operating condition. As the train approached the crossing the engineer saw Mr. Lang, "he was coming off the second track to the right, which would be the west track, coming over the east rail of the second track to the right when I first noticed him." He said that Mr. Lang was walking at a reasonable rate of speed, "He was in no hurry," and if he ever looked towards the train the engineer did not notice the fact. At that moment the engineer was sounding the "crossing whistle" and as Mr. Lang "started over, I would say the north rail of the track next to us," walking at about the same rate "and when he seemed to get close enough that he wouldn't stop or wasn't going to stop," he gave a "stop alarm or warning signal," immediately "started a full service application" and the train stopped on the crossing.

The railroad contends that the plaintiff's uncontradicted evidence, by which he is bound (the testimony of the engineer and fireman), shows conclusively that the engineer did everything within his power to stop the train or slacken its speed as soon as it reasonably appeared that Mr. Lang was oblivious to the danger of the oncoming train. It is urged that there is no evidence of a distance separating the train and Mr. Lang when he came into a position of peril, that his evidence "either fails or it shows a distance so short that *the train could not have stopped*" and, therefore, the plaintiff failed to make a submissible

case under the humanitarian doctrine. In this connection it is urged that the court prejudicially erred in giving instruction number one for the reason that it was confusing, failed to guide the jury in determining the issuable fact of imminent peril, and extended the zone of peril to a place where it did not exist under the plaintiff's own evidence, to all four sets of the tracks. Also in this connection, it is urged that the testimony of the plaintiff's expert witness that the train could have been stopped in 178 feet is so contrary to physical fact and the observation and experience of mankind that it must be disregarded and that without his testimony there is no evidence that the engineer could have averted the accident after Mr. Lang came into a position of peril.

The difficulty with the appellant's argument, in part, is that it ignores or fails to take into consideration the force of the three essentially distinguishing factors involved in this particular occurrence and appeal. In part the argument ignores the evidence and reasonable inferences with respect to Mr. Lang's obliviousness. The defendant's liability was submitted and hypothesized upon a finding of ability, in the circumstances, to slacken the speed of the train as well as upon ability to stop. And in all these respects the argument overlooks the probative force of what, undeniably, the engineer actually did and what as a matter of incontestable physical fact actually happened with respect to the train.

Whatever the distance from the intersection of Pacific Street and the westernmost track, Mr. Lang, in crossing over the walkway, walked across three sets of tracks and the space between them and was struck on the fourth or easternmost set of tracks by the left side of the pilot when he "was just getting ready to get off this last rail." He was "in no hurry," "just walking," at a normal rate of speed, two to three miles an hour or 2.9 to 4.4 feet a second. Wofford v. St. Louis Public Serv. Co., (Mo.) 252 S. W. (2) 529, 531; Rosenberg v. Terminal R. R. Ass'n., (Mo.) 159 S. W. (2) 633, 635. Bearing upon Mr. Lang's obliviousness, the engineer, as noted, said that he saw him crossing over the east rail of the second track to his right, a point 28 feet 11 ¼ inches from the center line of the easternmost track, and that when he seemed to get close enough that he "wouldn't stop or wasn't going to," just over the left rail of the next track, a point 17.66 feet from the center line of the east track, he gave the emergency alarm and set the brakes. The inference the appellant would have drawn from these circumstances is that this was the precise moment at which Mr. Lang's obliviousness reasonably appeared to the engineer. It is not necessary to consider whether other inferences were reasonably permissible from these facts alone because there were other circumstances. The fireman said that when he first saw Mr. Lang, "He was in the vicinity *between the first and second track.* * * * Q. You mean the second rail of the first track and the first rail of the

second track? A. That's right. * * * Q. What was he doing when you first saw him? A. Just walking. Q. Was he looking at the train? A. No, he wasn't. Q. Was any whistle being sounded when you first saw Mr. Lang? A. *When I first saw him the regular crossing whistle was being sounded.* Q. What happened after that time? A. *Well, it was evident he was going to keep walking, and the alarm whistle was sounded.* Q. Where was Mr. Lang when the alarm whistle was first sounded? A. I would say probably between the second and third tracks. Q. In other words, he hadn't crossed one complete set of tracks? A. That's right. Q. Was he still looking ahead? A. Still looking ahead. * * * Q. *Where was Mr. Lang, if you know, when he first applied the brakes?* A. *He was on the third track, I would say.* * * * Q. Did Mr. Lang travel some distance between the time the crossing blast was being sounded and the time the short blasts were being sounded? A. That's right. He never changed his pace. * * * Q. Had the train slowed any by the time the accident happened? A. Well, it would be very little.'' Of necessity, the appellant, and immediately the engineer, saw and were aware of what the fireman saw and reasonably knew from Mr. Lang's conduct, and all were bound to act accordingly. Harrington v. Thompson, (Mo.) 243 S. W. (2) 519, 523; Hoelzel v. C., R. I. & P. Ry. Co., 337 Mo. 61, 73, 85 S. W. (2) 126, 131. These latter circumstances substantially support the inference and finding of Mr. Lang's obliviousness and the engine crew's awareness of the fact even as he left the first set of tracks. Stith v. St. Louis Pub. Serv. Co., 363 Mo. 442, 251 S. W. (2) 693; Stokes v. Wabash R. Co., 355 Mo. 602, 197 S. W. (2) 304. A pedestrian about to enter upon a railroad crossing, oblivious of an oncoming train, is in a position of imminent peril, and his obliviousness extends the danger zone. Cable v. C., B. & Q. R. Co., 361 Mo. 766, 776, 236 S. W. (2) 328, 333; Stokes v. Wabash R. Co., supra; Banks v. Morris & Co., 302 Mo. 254, 267, 257 S. W. 482, 485.

It is not necessary to a disposition of this appeal to consider whether in the circumstances the train could have been stopped after it reasonably appeared that Mr. Lang was oblivious and the engineer had been made aware of the fact. And in considering whether, under the evidence, the plaintiff's cause of action was submissible under the humanitarian doctrine, the testimony of the plaintiff's expert that the train could have been stopped in 178 feet may be ignored. While this expert's opinion, based upon a formula called ''the coefficient of friction,'' was lacking in convincing foundation (Moeller v. St. Paul City Ry. Co., 218 Minn. 353, 362, 16 N. W. (2) 289, 295, 156 A.L.R. 371, 379), it may not be said, in view of other factors, that his testimony was so prejudicial and that the trial court so abused its discretion as to compel the granting of a new trial. Bebout v. Kurn, 348 Mo. 501, 154 S. W. (2) 120; Irwin v. St. L.-S. F. Ry. Co., 325 Mo. 1019, 1027, 30 S. W. (2) 56, 59. Unlike East v. McMenamy, (Mo.) 266

S. W. (2) 728, the length of time and the distances in which the plaintiff was in peril are inferable and demonstrable from the circumstances without the testimony of the expert as to the distance in which the train could be stopped. The engineer saw Mr. Lang when he was 28 feet 11 ¼ inches, and again 17.66 feet, from the center line of the main line track, and the fireman saw him and from his conduct could have been aware of his obliviousness when he was 42 feet away, and yet there was no attempt whatever to slacken the speed of the train. There was no opinion evidence to show the amount of slackening possible within the time and distances available (Stith v. St. Louis Pub. Serv. Co., supra), but there is no more cogent, probative evidence of what could and should have been done than what as a matter of indisputable fact was done. Perkins v. Terminal R. R. Ass'n., 340 Mo. 868, 879-880, 102 S. W. (2) 915, 920; Ellis v. Metropolitan St. Ry. Co., 234 Mo. 657, 138 S. W. 23.

As we have said, the "Meteor" was a thirteen-car train with a two-unit Diesel locomotive. The train was traveling at a speed of twenty-five miles an hour, and, according to the fireman, the speed had been' slackened "very little," "I would say the speed per hour hadn't changed much," when Mr. Lang was struck, near the east rail of the main line track. Nevertheless, after the "stock alarm" had been given and after a "full service application" of the brakes, the train stopped, the engineer said, with "the rear end of the second car behind the engine" right on the crossing. The vestibule door of the car on the crossing was opened and the train crew and others went through that door to Mr. Lang, to the east of the crossing. Others thought the train may have stopped with the third or fourth car on the crossing. In any event, the two-unit locomotive was 142 feet long, each of the next three coaches was 73 feet long and the fourth coach from the locomotive was 65 feet long. So, without question, the train was actually stopped, at the maximum, with the front end of the locomotive 426 feet from the crossing. The railroad's expert, allowing for reaction time and "brake lag," gave it as his opinion that the train could not be stopped in less than 498 to 500 feet. (Compare: Shelton v. Thompson, 353 Mo. 964, 185 S. W. (2) 777.) Using these figures, the "Meteor's" engineer started his brake application a maximum distance of 72 feet before the train actually struck Mr. Lang—498 feet less 426 feet. "We have held that, when a car actually stops in a certain distance, there is no need of theorizing upon inability to stop in that distance. In such case an expert is functus officio." Ellis v. Metropolitan St. Ry. Co., 234 Mo., l.c. 685, 138 S. W., l.c. 32. These are not the most favorable inferences, but they certainly demonstrate circumstantially, if not mathematically, that the speed of the train could have been sufficiently slackened for Mr. Lang to have walked the distance from the east rail of the easternmost track to safety, thus demonstrating, hypothetically, a submissible case and all the essential

elements under the humanitarian doctrine. Stith v. St. Louis Pub. Serv. Co., supra; Stokes v. Wabash R. Co., supra; Shelton v. Thompson, supra; Smith v. Thompson, 346 Mo. 502, 142 S. W. (2) 70, 74; Kloeckener v. St. Louis Pub. Serv. Co., 331 Mo. 396, 53 S. W. (2) 1043.

■ What we have said upon the merits of the case, particularly with respect to specific distances, obliviousness, and the ■ zone of peril, may inferentially dispose of the appellant's objections to instruction one. The instruction does not contain the vice of positive misdirection considered in the Stith case. The principal objection is that the instruction improperly extends the zone of peril to all four sets of tracks in the crossing when, it is said, there was no evidence to support the inference that the engineer saw the plaintiff on the westernmost track, or had reason to believe that he would continue on into the path of the train from that point. The inferences permissible from the fireman's testimony may obviate the necessity of considering this objection. In any event the instruction in its beginning, probably unnecessarily, requires a finding that "plaintiff was crossing the four sets of defendant's railroad tracks," but that finding has no reference either to obliviousness or to the zone of peril. The instruction does not in specific terms indicate or delimit the zone of peril. As to Mr. Lang's position of imminent peril the instruction subsequently says, "and that while crossing said tracks plaintiff became and was in a position of imminent peril and danger of being struck * * *." While Harrington v. Thompson, (Mo.) 243 S. W. (2) 519, involved failure to warn in a truck-crossing case, the court explained and pointed out the distinguishing factors of the Cable case and of Smithers v. Barker, 341 Mo. 1017, 111 S. W. (2) 47. In its essentials the instruction involved here is fairly comparable to the instruction involved in the Harrington case and, in the circumstances, it was not so prejudicially erroneous as to demand the granting of a new trial.

■ The appellant also contends that a new trial should be granted for the reasons that the trial court erred in admitting in evidence three pages of a hospital record and the answer of one of plaintiff's medical witnesses to a hypothetical question which omitted a material undisputed fact in evidence.

When Mr. Lang was injured on October 2nd, he was taken to St. Francis Hospital in Washington where he remained seven days, and was then removed to Barnes Hospital in St. Louis. As his first witness plaintiff's counsel called the "Medical Record Librarian, St. Francis Hospital" and had her identify "exhibit one" as the X rays and complete medical record concerning Mr. Lang while a patient in that hospital. The witness only identified the records, the original entries had been made by "the various departments" and the doctors. Subsequently, in the trial of the case, plaintiff's counsel offered the exhibit in evidence and proposed to read portions of it to the jury, particularly pages 2, 4 and 5. Upon specific objection that the records

were hearsay and not adequately identified other pages of the exhibit were excluded or withdrawn, and it is now urged that the court erred in admitting in evidence these three pages. It is not necessary to say whether these records were admissible in evidence in the circumstances, it is assumed for the purposes of this opinion that they were inadmissible, or, that the court in its discretion could properly have excluded them as the court did in Gray v. St. L.-S. F. Ry. Co., 363 Mo. 864, 254 S. W. (2) 577. But it does not follow as a matter of course that the appellant is entitled to a new trial. Melton v. St. Louis Public Service Company, 363 Mo. 474, 488, 251 S. W. (2) 663, 671. There is no demonstration upon the record that the reading of the three pages was so manifestly prejudicial in any matter materially affecting the trial of the cause as to demand the granting of a new trial. It is only claimed that the pages of the exhibit were not properly identified, constituted hearsay, and merely because inadmissible under the Uniform Business Records as Evidence Law (V.A.M.S., Secs. 490.660-490.690) compel the granting of a new trial. To illustrate, it is said that page two is "pure hearsay," purports to record happenings through an unidentified doctor, and is nothing more than a narrative summary of the handling of plaintiff's case from the time he was injured until he was transferred to Barnes Hospital. Page two recited the fact of Mr. Lang's injury when struck by a train, his age, the calling of a doctor for emergency treatment, the calling in of a consultant from St. Louis and his removal to Barnes Hospital after X rays revealed a "badly fractured leg" and a "hemothorax due to fractured ribs and contusion of the chest." In addition "the final diagnosis" recited a concussion of the brain. The other pages recited the emergency treatment and blood transfusions. It is not necessary to set forth all the statements, it is sufficient to note that many of these facts were admitted, at least there was no question or dispute concerning them. The doctors who examined and treated Mr. Lang in St. Louis testified in detail as to the nature and extent of his injuries and their treatment, and their testimony, which was undisputed, indicated more serious injuries and painful treatment than the hearsay contained in this exhibit. In these circumstances it may not be said that the admission in evidence of the three pages from the hospital record was so manifestly prejudicial as to compel the remanding of the case for a new trial. Melton v. St. Louis Pub. Serv. Co., supra.

 And so it is with the claims that the court erred in allowing Mr. Lang to demonstrate his limp for the benefit of a doctor, and in permitting the doctor to answer hypothetical questions as to his disability in this respect which omitted a material undisputed fact in evidence, the fact that Mr. Lang walked with a limp prior to his injury. It is not certain from the record that the prior limp was established as a "material undisputed fact," it may have been "just a funny way of walking." But assuming that it was established as a "fact" from evi-

dence introduced by the plaintiff, it does not follow that the court's refusal to compel its inclusion in the hypothetical questions constitutes prejudicial error. Although of importance the fact was not material in the sense that its omission "eliminated any other cause" upon a very essential issue in the case as in De Donato v. Wells, 328 Mo. 448, 41 S. W. (2) 184. While hypothetical questions must be proper in both form and content and contain all material facts relating to the subject matter, the trial court has some discretion as to what must be included (32 C.J.S., Sec. 551(b)(1), p. 350) and the omission of some fact or facts and the mere violation of the general rules does not always constitute such prejudicial error as to demand the granting of a new trial. Dillard v. East St. Louis Ry. Co., (Mo. App.) 150 S. W. (2) 552; Kirk v. Kansas City Term. Ry., (Mo. App.) 27 S. W. (2) 739. It is not deemed necessary to detail the testimony concerning the prior limp or the hypothetical questions and answers, the nonprejudicial effect of these latter questions concerning the hospital records, the demonstration and the limp, plainly appear when the nature and extent of his injuries and the proof concerning them are considered.

■ Mr. Lang was in the St. Francis Hospital in Washington seven days, but he had no recollection of the fact. He was unconscious and his first memory was of Barnes Hospital in St. Louis where he remained for six weeks. When seen in Barnes Hospital he had a hematoma of the scalp and "central nervous system findings suggestive of a concussion of the skull." There were multiple rib fractures of the left chest, "ribs two to nine being broken." The fractured ribs caused an accumulation of blood in the left pleural cavity and Dr. Burford "did a thoracentesis" and removed six hundred cc's of blood from his chest. To relieve his pain from the seven fractured ribs he did an intercostal nerve block, injected novocain into the nerves between the fractured ribs. The ribs were broken cleanly, simple complete breaks, and healed in about three months. While he probably has some permanent disability from the injury to his chest and ribs, the disability is not serious. His most serious injury was "a fracture of the sub-trochanteric region of his left femur," just below the hip. Skeletal traction was attempted but the doctor was unable to obtain a satisfactory reduction of the fracture by that method. The fracture was then reduced by an operation which the doctor described in detail, and from which there remains some permanent disability, loss of motion in the hip and knee joints. Other items of expense are not satisfactorily made to appear but this doctor's fee was $750.00 and Dr. Burford's fee was $35.00. Mr. Lang was sixty-seven at the time of his injury in 1951, his income is low, but considering ■ the nature and extent of his injuries and all the factors, the verdict of $18,359.00 is not so plainly excessive as to compel a remittitur. Berry v. Emery, Bird, Thayer Dry Goods Co., 357 Mo. 808, 211 S. W. (2) 35; Hill v. Montgomery, 352 Mo. 147, 176 S. W. (2) 284; Summa v. Morgan Real Estate Co., 350 Mo. 205, 165

S. W. (2) 390; Davidson v. Rodgers, (Mo.) 258 S. W. (2) 648. Accordingly the judgment is affirmed. *Westhues* and *Bohling, CC.,* concur.

PER CURIAM:—The foregoing opinion by BARRETT, C., is adopted as the opinion of the court. *Leedy,* Acting P. J., *Ellison,* J., *Bennick* and *Broaddus,* Special Judges, concur.