John CARTER, Respondent,

v.

CONSOLIDATED CABS, INC., and
Chat McCoy, Appellants.

No. 57339.

Supreme Court of Missouri,
Division No. 1.

Jan. 8, 1973.

Motion for Rehearing or for Transfer to Court
En Banc Denied Feb. 12, 1973.

Morris, King, Stamper & Bold, M. Randall Vanet, Kansas City, for respondent.

Michael J. Maloney, of Popham, Popham, Conway, Sweeny & Fremont, Kansas City, for appellants.

HIGGINS, Commissioner.

Action for damages for personal injuries in which defendants appeal from verdict and judgment for plaintiff for $80,000. (Appeal taken prior to January 1, 1972.)

Appellants contend the court erred in submitting plaintiff's case under the humanitarian doctrine "because plaintiff failed to prove (1) that defendant McCoy saw or in the exercise of the highest degree of care could have seen plaintiff in a position of imminent and immediate peril of being struck and injured in time thereafter with safety to defendant McCoy and all others and with the means and appliances at hand to have swerved; (2) that defendant McCoy by such a swerve could have avoided injury to plaintiff; (3) that defendant McCoy was negligent."

This action arose from an occurrence around 12:30 a. m., August 11, 1967, just west of the intersection of 39th Street and Indiana Avenue in Kansas City, Missouri. Indiana runs north and south; 39th carries one lane of traffic each direction and has one parking lane on each side of the street. A 10-foot-wide crosswalk crossed 39th, the eastern edge of which was the curb line of Indiana. East-west traffic crossing Indiana was controlled by a blinking yellow traffic signal; north-south traffic crossing 39th was controlled by a blinking red signal.

Plaintiff, a pedestrian, was attempting to cross 39th Street by walking south at a point 26 feet west of the intersection. He was a porter in a drugstore on the northwest corner of the intersection, and he and a clerk in the store, Anthony J. Cusumano, had locked the store and were proceeding south toward a parking lot on the southwest corner of the intersection, where the clerk's car was parked.

A taxicab, owned by defendant Consolidated Cabs, Inc., was being operated by Consolidated's agent, defendant Chat McCoy, westerly on 39th Street. There was no other traffic in either direction and no cars were parked on 39th. Defendants' cab and plaintiff came into collision at an agreed point of impact 10 feet south of the north curb line of 39th and 26 feet west of the west curb line of Indiana.

As plaintiff and Mr. Cusumano were proceeding to cross 39th, Mr. Cusumano stopped near the curb with plaintiff somewhere to his right when Mr. Cusumano first observed the cab. The cab was then in the middle of the intersection proceeding at 18 to 20 miles per hour. Mr. Cusumano shouted a warning to plaintiff, the cab skidded to a halt, plaintiff and the cab collided in the area of the right front wheel of the cab. Plaintiff fell or was knocked backward as a result of the collision; the cab skidded two or three feet beyond the point of impact and stopped. Total skid of the cab was 24 feet. Such marks began approximately in the center of the crosswalk or a little west of the center of the crosswalk. The wheels of the cab were locked by braking and the skid marks were straight.

The intersection was well lighted, pavement was dry, and 39th Street was 10 to 15 per cent upgrade east of the intersection. Officer Weidemeyer computed McCoy's speed under the circumstances at 17.7 miles per hour based upon average reaction time of three fourths of a second, which McCoy claimed he possessed; and testified that a car would travel 20.6 feet at 18 miles per hour.

Police Sergeant McKinney stated a car traveling at 20 miles per hour would travel 36.8 feet before stopping in combined reaction time distance and braking distance.

Police Sergeant Maxwell performed skid tests at the scene and determined coef-

ficiency of friction at 90 per cent, and calculated McCoy's speed, using average reaction time, at approximately 19 miles per hour based upon the overall skid distance of 24 feet.

Sergeant Maxwell also stated the cab could have swerved two feet in 10 feet, four feet in 14 feet, and 10 feet in 25 feet of the skid distance.

Plaintiff recalled the warning given by Mr. Cusumano but remembered little else about the occurrence.

Mr. McCoy saw plaintiff attempting to cross the street and thought plaintiff did not see him and the cab. He did not attempt to swerve; instead, he applied his brakes. He agreed that he stopped in plaintiff's path and that if he had swerved he would have gotten farther away from plaintiff.

The physical facts show the distance from the point of impact back to the middle of the intersection to be 47 feet and the distance from point of impact to east edge of the intersection to be 68 feet. Had defendant responded to the danger of striking plaintiff when in the middle of the intersection, he would have used 20.6 feet during reaction time and would have had 26.4 feet in which to swerve, during which he could have swerved more than 10 feet to his left. Had defendant observed the danger when at the east edge of the intersection, he would have used 21 feet during reaction, one half of the intersection, and still would have had one half the intersection in which to swerve left into the eastbound lanes of 39th Street and clearly have avoided plaintiff.

That defendant could have seen plaintiff as far back from impact as the east edge of the intersection is shown by defense counsel's admission in opening statement that Mr. McCoy first saw Mr. Cusumano as he, McCoy, started into the intersection, and he saw Mr. Cusumano before he saw plaintiff who was to the right of Mr. Cusumano.

Mr. Cusumano first saw the cab when he was about two feet off the curb at which time plaintiff was a step and a half ahead of him and to his right. This could have placed plaintiff approximately five or six feet into the street and north of impact by four or five feet at a time when Mr. McCoy was east of impact by 68 to 75 feet, with unobstructed visibility.

Plaintiff's obliviousness was shown by Mr. McCoy's admission that plaintiff was unaware of the cab and kept walking toward it, and by plaintiff's failure to heed the warning of Mr. Cusumano.

Similarly, plaintiff was in a zone of peril at all times after he was five to six feet into the street and four or five feet from impact, all of which was in defendant's path if he continued in the northern lane of 39th Street without swerving to his left.

■ Accordingly, all the elements of a humanitarian case, Banks v. Morris & Co., 302 Mo. 254, 257 S.W. 482, are present under the evidence in this case, and defendants' contention to the contrary is without merit. For support in the cases, see, e. g., Leap v. Gangelhoff, Mo., 416 S.W. 2d 65, 67–68 [1–6]; Dillon v. Hogue, Mo. App., 381 S.W.2d 599; Triller v. Hellwege, Mo., 374 S.W.2d 104; Losh v. Benton, Mo., 382 S.W.2d 617; McCarthy v. Wulff, Mo., 452 S.W.2d 164; Williams v. Ricklemann, Mo., 292 S.W.2d 276; Murphy v. Land, Mo., 420 S.W.2d 505. By comparison, appellants' citations, Elam v. Allbee, Mo. App., 432 S.W.2d 379, Dister v. Ludwig, Mo., 240 S.W.2d 694, Vietmeier v. Voss, Mo., 246 S.W.2d 785, McGowan v. Wells, 324 Mo. 652, 24 S.W.2d 633, Davis v. St. Louis Public Service Co., Mo., 316 S.W.2d 494, and Adelsberger v. Sheehy, 332 Mo. 954, 59 S.W.2d 644, may be distinguished on their facts.

■ Appellants also claim the testimony of Mr. Cusumano should not be considered with respect to the position of plaintiff because it was "contrary to the physical facts." See Davis v. St. Louis Public Serv-

ice Co. and Adelsberger v. Sheehy, supra. Suffice to say that Mr. Cusumano was thoroughly deposed, examined, cross-examined, and rehabilitated; and discrepancies in his testimony, if any, were for resolution by the jury as judges of the credibility of the witnesses.

Plaintiff's case was submitted by Instruction No. 3, MAI 17.14: "Your verdict must be for plaintiff, whether or not plaintiff was negligent, if you believe: First, plaintiff was in a position of immediate danger of being injured and was injured, and Second, defendant Chat McCoy knew or by using the highest degree of care could have known of such position of immediate danger, and Third, at the moment when defendant Chat McCoy first knew or could have known of such position of immediate danger, he still had enough time so that by using the means available to him and with reasonable safety to himself and all others and by using the highest degree of care he could have avoided injury to the plaintiff by swerving, and Fourth, defendant Chat McCoy negligently failed to so swerve, and Fifth, plaintiff's injury directly resulted therefrom."

Defendants' converse of plaintiff's case was submitted by Instruction No. 4, MAI 33.06(6): "Your verdict must be for defendants if you do not believe: First, defendant Chat McCoy knew or by using the highest degree of care could have known of plaintiff's position of immediate danger, and Second, at the moment when defendant Chat McCoy first knew, or by using the highest degree of care could have known, of plaintiff's position of immediate danger, he then had enough time by using such care to have avoided injury to plaintiff by swerving, and Third, defendant Chat McCoy had the means available to him to have avoided injury to plaintiff by swerving, and Fourth, defendant Chat McCoy by using the highest degree of care

could have avoided injury to plaintiff by swerving without either endangering himself or others, and Fifth, plaintiff sustained damage as a direct result of defendant Chat McCoy's conduct."

In addition, the court, upon plaintiff's request, gave a definition, Instruction No. 5, MAI 11.01: "The term 'highest degree of care' as used in these instructions means that degree of care that a very careful and prudent person would use under the same or similar circumstances."

No instruction defining negligence was requested by or given in behalf of either party; yet appellants contend "the court erred in failing to instruct the jury on the definition of negligence [negligently] as the term was used in Instruction No. 3 * * * because such a definition [1] is required by MAI and the failure to give such an instruction allowed the jury to return a verdict based upon their interpretation of a term of law undefined to them which constitutes a roving commission to the jury."

 It is true that an instruction that allows a jury " 'to return a verdict based upon their interpretation of a term of law not appearing in the verdict director and undefined to them' " constitutes a roving commission to the jury. Brewer v. Swift & Co., Mo., 451 S.W.2d 131, 133 [1]. Such is not the situation in this case, however, because the term "negligently" as a basis for the jury's verdict does appear in plaintiff's verdict-directing instruction, and not all omissions of definition are reversible error. Brewer v. Swift & Co., supra, dealt further with a charge of error in omitting to define negligence in defendants' converse based upon plaintiff's failure to exercise ordinary care to see the space between two platforms in his slip-and-fall submission. With respect to plaintiff-appellant's attack on failure to define negligence, the court held, l. c. 133 [2]: " 'It does not ap-

---

1. Appellants assert the court should have given MAI 11.03: "The term 'negligence' as used in this [these] instruction[s] means the failure to use the highest degree of care that a very careful and prudent person would use under the same or similar circumstances."

pear that the instructions for use of MAI specifically require the use of a definition instruction for negligence. The section of MAI entitled How To Use This Book does state, "Submitting ultimate facts stripped of evidentiary detail created a need for some definition instructions." (Page XXXII[2], Committee on Jury Instructions.) And we note that the illustrations contained in Sec. 31.00 of MAI each contain a definition of negligence. Although we do not hold that in every case the giving of a negligence definition is required by MAI, it would appear to be a better practice to include such definition where the term "negligence" appears in any of the instructions.' "

Appellants argue that a definition of negligence was mandatorily required, citing Helfrick v. Taylor, Mo., 440 S.W.2d 940, 945 [5]; however, that statement to such effect later was held to be dictum. Brewer v. Swift & Co., supra, 451 S.W.2d l. c. 134.

Other citations of appellants are also inapposite: In Cunningham v. Hayes, Mo. App., 463 S.W.2d 555, the distinguishing factor was that of *res ipsa loquitur*, "in which case because of the necessity of a finding of probability of negligence [from the circumstances] it was held that negligence must be defined as set forth in MAI 11.02(1), as a necessary ingredient of that probability," Robinett v. Kansas City P & L Co., Mo.App., 484 S.W.2d 506, 510; in Epps v. Ragsdale, Mo.App., 429 S.W.2d 798, there was a positive misdirection in that the court gave an inapplicable definition instruction; in Zipp v. Gasen's Drug Stores, Inc., Mo., 449 S.W.2d 612, the court refused to consider omission of an appropriate definition as a subject of plain error; in Brown v. Bryan, Mo., 419 S.W.2d 62, and Murphy v. Land, Mo., 420 S.W.2d 505, the court was simply considering presumptively prejudicial deviations from MAI; and in Rakestraw v. Norris, Mo.App., 478 S.W. 2d 409, the court held only that "because of the broad generality of the lookout

submission, * * * the terms 'negligent' and 'negligence' [as used therein] should have been defined." Apropos the present case, "No such broad generality * * * here exists." Robinett v. Kansas City P & L Co., supra, 484 S.W.2d l. c. 509 [2].

By way of contrast, defendants, as well as plaintiff, had full opportunity to argue their respective sides of the negligence issue, failure to swerve, and the standard of care applicable to defendants, the highest degree of care. Failure to swerve is not a technical term, but rather is one in everyday understanding of jurors, and highest degree of care was defined. If defendants felt the submitted negligence required further definition, they were free to offer the appropriate MAI definition but declined or failed so to do. In such circumstances the omission of an instruction defining negligence certainly was not a misdirection and does not constitute reversible error. Robinett v. Kansas City P & L Co., supra, l. c. 510 [3, 4].

Appellants charge error "in sustaining plaintiff's objection to, and in prohibiting reference by defense counsel to, plaintiff's statement that he had seen the cab and continued on because he thought the cab had time to stop for him and in sustaining plaintiff's objections to defense counsel's assertion that the evidence supported the fact that plaintiff saw the cab and determined to proceed * * *."

In presenting this contention, appellants "recognize that the trial court does and should have broad discretion in matters of improper argument * * *." They argue, however, that their argument was permissible as bearing on plaintiff's obliviousness and the zone of peril.

■ The difficulty with such argument in this case is that defendant McCoy, himself, established plaintiff's obliviousness, the zone of peril was determinable as previously demonstrated, and a fair interpretation of the rejected argument is that it

2. Now page L, MAI 2nd Edition.

would have been a comment on plaintiff's own negligence which would have been improper in this humanitarian case. Accordingly, the ruling was not an abuse of the discretion generally accorded the trial judge in control of closing arguments. Jones v. Gooch, Mo.App., 453 S.W.2d 653, 655 [2].

Finally, appellants contend the court erred in not granting defendants a new trial "for the reason that the verdict of the jury was so excessive as to be the result of bias and prejudice on the part of the jury * * *." In this respect, they make no claim that the verdict was so excessive as to be subject to remittitur.

The transcript supports the following as a statement of plaintiff's injuries and damages:

Plaintiff was struck as a pedestrian by defendants' taxicab and received multiple comminuted fractures above and below both knees and a pelvic fracture. He later sustained at least two falls when his legs gave out on him. As a result of the first fall he had a neck fracture of the left femur with absorption of the neck of the femur and has a hanging hip. As a result of the second fall, he had a fracture of the right femoral neck and it was replaced by an Austin-Moore prosthesis. He will never walk again.

Plaintiff was initially hospitalized for five months for the fractures of his legs and pelvis at General Hospital from August 11, 1967, through January 12, 1968. He was later hospitalized for forty days for his right hip fracture from April 20, 1971, to June 1, 1971.

With respect to the left leg, plaintiff received a comminuted fracture of the lateral tibia plateau, a comminuted fragmented fracture of the shaft of the tibia about three inches below the knee joint, a fracture through the lateral area of the head of the fibula with some displacement, and the left leg was placed in a cast for about four weeks. With respect to the left leg, plaintiff received a femur broken at the lower end where it articulates on the tibia, with a fracture through both of the balls that form the lower end of the tibia, a depression of the articular surface on the medial side of the tibia, a fracture through the neck of the fibula with minimal displacement, and the lateral collateral ligament, which gives stability to the knee joint, was torn. Both knee injuries are permanent.

With respect to the pelvic fractures, there was a segmental fracture of the inferior public ramus on the left and a fracture on the superior border.

The normal gliding movement was completely destroyed in both knees. Both legs were initially placed in traction and a Steinman pin was placed through the left leg below the knee. He developed osteomyelitis from the Steinman pin and the infected and dead bone was scraped from the wound.

Plaintiff was placed in balanced traction with pulley attachments. Plaintiff worked hard at this and did incur a significant amount of pain while doing it. The only other treatment available to plaintiff was to make the knees absolutely stiff to eliminate his pain, but Dr. Fisler testified that this was not a desirable result.

The right leg was manipulated in an attempt to move the bones of the thigh around so the knee joint would be more regular. The left leg was placed in a plaster cast as the fracture fragments were originally so significantly displaced that it was felt no intervention by way of open surgery would be of benefit to the patient. There was no open reduction because of his age and the degree of the shattering of the bones.

At the time of the injury, plaintiff had no significant degree of arthritis. He received traumatic arthritis in both knees as residuals from this accident which is a

further disability and will involve persistent pain and persistent loss of motion in both knees.

X rays taken just prior to trial of the right knee showed complete healing and one can see marked bony exostosis or projection in the knee joint which as it rotates back and forth on the thigh bone will tear up what articular surface is left. Arthritic changes in the right knee are observed since the initial X rays taken after the accident. An X ray of the right leg shows cystic degeneration, softening of the bone which is a precursor to further arthritis. An X ray of the left leg taken just prior to trial shows the joint is full of arthritis and cystic degeneration.

As a result of the fall in April, 1971, he sustained a fracture of the right femoral neck, the head was removed by surgical intervention, and it was replaced with an Austin-Moore prosthesis. It came to light during the second hospitalization that plaintiff had earlier sustained an aseptic necrosis of the left femoral neck fracture with complete disappearance and absorption of the neck of the femur on that side, which was the result of an older fracture at some time between the X ray of August 11, 1967, and this X ray taken April 20, 1971.

In summary, the testimony was that all of the injuries are permanent. The doctor stated that plaintiff would not be able to walk again. He summarized his reasons as marked arthritis in both knees, laxity of the ligaments of the knees, complete non-union of the left hip, fracture of the right hip with a prosthetic replacement, marked muscle wasting of his legs, the vastus medialis is completely gone, and legs are completely atrophied through inability to use them.

Plaintiff was 82 years old when injured and, prior to injury, had been working as a porter making wages recognized by defendants to amount to a loss of $3,248 at trial time in June 1971. He was in good health prior to injury.

Defendants did not examine plaintiff, nor did they submit any countermedical evidence; and appellants make no demonstration of the asserted bias and prejudice of the jury. They cite only Crane v. Northup, Mo., 413 S.W.2d 190, a remittitur case, to present the factors to be considered in review of the verdict, i. e., nature and extent of injuries and losses, plaintiff's age, and diminished earning capacity; and, for recognition of the ultimate test of excessiveness or inadequacy, i. e., what will fairly and reasonably compensate plaintiff for the injuries and losses sustained.

■ With the case in this posture, it may not be said as a matter of law that the verdict was so excessive as to show it to be a product of bias and prejudice or misconduct of the jury. The transcript shows the case was fairly and unemotionally tried; and the $80,000 verdict is not demonstrated to violate the standard of fair and reasonable compensation for the injuries and losses this plaintiff sustained.

Judgment affirmed.

WELBORN, C., concurs.

PER CURIAM:

The foregoing opinion by HIGGINS, C., is adopted as the opinion of the court.

HOLMAN, P. J., SEILER, J., and KEET, Special Judge, concur.

BARDGETT, J., not sitting.