**Billy Ray WISEMAN, Sr., et al., Plaintiffs-Respondents,**

v.

**MISSOURI PACIFIC RAILROAD COMPANY, Defendant-Appellant.**

**No. 39135.**

Missouri Court of Appeals, St. Louis District, Division Four.

Nov. 14, 1978.

Motion for Rehearing and/or Transfer to Supreme Court Denied Jan. 12, 1979.

Application to Transfer Denied Feb. 13, 1979.

R. A. Wegmann, Ray Dickhaner, Dennis Tesreau, Richeson, Roberts, Wegmann, Gasaway, Stewart & Schneider, P. C., Hillsboro, for defendant-appellant.

John W. Hammon, Anderson, Brooking & Hammon, Hillsboro, Robert J. Robinson, Dennis Gassen, Pannell, Dodson & Robinson, Festus, for plaintiffs-respondents.

SNYDER, Judge.

Plaintiffs-respondents, the surviving spouse and three minor children of Lulu Belle Wiseman, sued defendant-appellant, Missouri Pacific Railroad Company, to recover damages for Mrs. Wiseman's alleged wrongful death. She was struck and killed by a train as she walked across appellant's tracks at a crossing in DeSoto, Missouri. The case was submitted to the jury under the humanitarian negligence doctrine on the failure of appellant to slacken the speed of its locomotive. The jury returned a verdict for the respondents and awarded $185,000.00 in damages. The trial court entered judgment accordingly. Missouri Pacific Railroad Company appeals.

Appellant raises five grounds for reversal, contending that the trial court erred:

(1) in denying appellant's motion for directed verdict because the respondents failed to make a submissible case under the humanitarian doctrine on failure to slacken speed; (2) in failing to define the terms "negligence," "negligent" and "negligently" as used in the instructions to the jury; (3) in permitting argument and instructing on "aggravating circumstances" in connection with the calculation of respondents' damages; (4) in permitting respondents to "impeach" their own non-party witness, head brakeman David Storey; and (5) in admitting evidence on the position or direction of the locomotive and the head brakeman's training. These points are ruled against appellant and the judgment is affirmed.

## THE FACTS

Mrs. Wiseman, 38 years old, a pedestrian, was struck and killed at 5:38 p. m. on March 31, 1975 by a Missouri Pacific freight train at the intersection of the Missouri Pacific tracks and Miller Street in DeSoto, Missouri. Mrs. Wiseman was walking west on Miller Street, at a right angle to appellant's north-south railroad tracks. Walking along the southernmost edge of the pavement of Miller Street, she had crossed five of the seven railroad tracks when she stepped onto the sixth track and into the path of appellant's north-bound train. She was struck by the front of the locomotive and knocked to the ground. Her body was found north of the crossing, lying between the rails.

Mrs. Wiseman's sight and hearing were unimpaired. She was not depressed at the time of the accident. She was not under any medication and her use of alcohol was temperate. She was walking to the DeSoto high school to attend evening classes to obtain a high school equivalency certificate. Mrs. Wiseman, a DeSoto resident for nearly two years, was familiar with the Miller Street tracks, having crossed them many times by car and on foot. At the time of the accident, it was still daylight and visibility was good. The weather conditions were clear and dry.

The physical layout of the Miller Street crossing is unusual. East and West Main Streets in DeSoto are two different streets. Both run north and south, East Main parallel and adjacent to the Missouri Pacific tracks on the east, and West Main parallel and adjacent to the Missouri Pacific tracks on the west. Miller Street runs east and west. A person traversing Miller Street at this point, going from east to west as Mrs. Wiseman did, would first cross East Main Street, then the tracks, then West Main Street.

The crossing is guarded by railroad "cross-buck" signs and electric flashing red signals at all four corners. Witnesses to the collision testified these signals were operating at the time of the accident but it is not clear whether Mrs. Wiseman entered the crossing before or after the signals began to flash their warning.

There was evidence that these signals often flashed when no train was present (perhaps because six of the seven tracks are siding or switching tracks used by the appellant in connection with its depot and work yards in DeSoto). Witnesses for respondents testified they had waited up to 15 minutes with the signal lights flashing and no train in sight. There was also evidence that DeSoto residents are in the habit of crossing against the signals, even when a train is visible. Witnesses to this accident had in the past seen "close-call," near collisions at this intersection.

Appellant's freight train consisted of a locomotive, six empty hopper cars and a caboose. The diesel locomotive was being operated "backwards," that is, with the cab to the rear and the long end of the unit in front. The train's engineer, Fred Rohlfing, was seated at the controls on the west side of the cab. The head brakeman, David Storey, was seated on the east side of the cab.

When the locomotive is operated with the cab in front, the engineer and brakeman view the track through a cab-width front window. Each man has a full view of the track ahead and can see to both his right and his left. But when the locomotive is operated with the cab to the rear, as it was

here, each man's vision directly in front of the engine and to his partner's side is blocked by the long end of the engine. Thus, while engineer Rohlfing could see to the north and west but not to the east, head brakeman Storey could see to the north and east but not to the west. The engineer could not, therefore, see Mrs. Wiseman as she approached the train track from the east.

As the train approached DeSoto from Pea Ridge going north, it left the main track and continued on to DeSoto on a siding track. From the time the train entered the siding track until the occurrence of the accident, engineer Rohlfing was operating the train through the use of the throttle and automatic brake valve. During this entire period, the train's brakes were in "service application." In this mode, the brake shoes are directly in contact with the wheels, applying a slight amount of pressure. In the event of an emergency application of the brakes, having the brakes in "service application" saves a period of two or more seconds because the brake shoes are already in contact with the wheels. When the train was 200 feet from Miller Street, it was traveling approximately eight to ten miles per hour.

Head brakeman Storey, called as a witness by respondents, testified he first saw Mrs. Wiseman when she was 40 feet from the collision point. The train at this time was approximately 106 feet from the point of impact. Storey then looked away and did not see her again until she was 12½ feet from the point of collision. He realized her peril and shouted, "Oh, my God, she's not going to stop," but did not attempt to activate the emergency brake valve directly behind his seat in the cab. Approximately two to three seconds passed before engineer Rohlfing made an emergency application of the automatic brake valve and "big holed" the train, bringing it to a stop (by various estimates) 124 to 300 feet past the point of the collision. "Big holing," in railroad parlance, means placing the automatic brake valve in an emergency stop position.

Testimony of eyewitnesses and the train crew established that the train's whistle, bell and two front headlights were functioning at the time of the accident.

## THE HUMANITARIAN SUBMISSION

■ Appellant asserts the trial court should have granted its motion for a directed verdict at the close of respondents' evidence because the respondents failed to make a submissible case under the humanitarian doctrine.

In determining whether a submissible case was made, the evidence is considered in the light most favorable to the plaintiffs, accepting as true all that is not entirely unreasonable or contrary to physical facts or natural laws and giving to plaintiffs the benefit of all favorable inferences that reasonably may be drawn from such evidence. [Cites omitted].

*Epple v. Western Auto Supply Company*, 548 S.W.2d 535, 538 (Mo. banc 1977).

'[T]he granting of a motion for directed verdict is a drastic action by a trial court, and that it should be done only when all of the evidence and the reasonable inferences to be drawn therefrom are *so strongly against plaintiff that there is no room for reasonable minds to differ.*' (Italics added.) *Justice v. East St. Louis City Lines, Inc.*, Mo. Sup., 375 S.W.2d 150, 155.

*Moore v. Eden*, 405 S.W.2d 910, 914 (Mo. 1966). A review of the record indicates the respondents did make a submissible case.

Under a humanitarian submission, the plaintiff must establish the following five elements: 1) the plaintiff was in a position of immediate danger; 2) the defendant was aware or should have been aware of the plaintiff's position of peril; 3) after receiving such notice, the defendant had the present ability, with the means at hand, to have averted the impending injury without injury to himself or others; 4) the defendant failed to exercise the requisite care to avert such impending injury; and 5) by reason thereof, the plaintiff was injured. *Banks v. Morris &*

*Co.*, 302 Mo. 254, 257 S.W. 482 (banc 1924).

*Epple, supra*, 540.

As the court then notes:

The first step in establishing liability under the humanitarian doctrine is demonstrating that the plaintiff came into a position of immediate danger. This position is commonly defined by the Missouri courts as that position of danger to the plaintiff, whether or not the plaintiff was negligent in getting there, in which by reason of the then existing circumstances, if unchanged, injury to the plaintiff is reasonably certain and not a mere possibility. The peril must actually be imminent and may not be merely remote, uncertain or contingent. [Cites omitted].

*Epple, supra*, 540.

### Position of Immediate Danger and Notice to Appellant

The question of when and where the plaintiff (or plaintiff's decedent) came into a position of immediate danger is for the jury, provided that there is substantial evidence from which the jury can make that determination. *Epple, supra*, 540 and cases cited.

In light of the facts and circumstances of this case, could the jury have determined at what point Mrs. Wiseman entered into a position of immediate danger without resorting to speculation and conjecture?

Head brakeman David Storey testified that when he saw Mrs. Wiseman 12½ feet from the train track he exclaimed, "Oh, my God, she's not going to stop." There could be no clearer proof that Mrs. Wiseman had entered a position of immediate danger when she was at least 12½ feet from the point of collision. However, there was also substantial evidence to support a finding that decedent was in a position of immediate danger when she was as far as 40 feet from the point of collision and that her obliviousness, and hence her position of peril, should have been apparent to brakeman Storey.

'[T]he zone of imminent peril began and the duty of the engineer arose when it was or should have been reasonably apparent to him that the truck driver was oblivious of the approaching train and was intent on continuing across its path, * * * and it was his duty to act on reasonable appearances and at a time when action would be effective. * * * It is enough that the circumstances are such as to indicate a reasonable chance that this is the case. Even such a chance that the plaintiff will not discover his peril is enough to require the defendant to make a reasonable effort to avoid injuring him.'

*Grothe v. St. Louis-San Francisco Railway Co.*, 460 S.W.2d 711, 716 (Mo. 1970), quoting *Wabash Railroad Company v. Dannen Mills, Inc.*, 365 Mo. 827, 832, 288 S.W.2d 926, 929 (Mo. banc 1956).

Appellant argues that Mrs. Wiseman could have stopped in a step or two and that the zone of danger should be limited to a step or two from the overhang of the engine. In the absence of obliviousness on the part of the person approaching the path of a moving vehicle, such a narrow zone of peril may be appropriate. See, *Turbett v. Thompson*, 363 Mo. 577, 252 S.W.2d 319 (Mo. 1952); *Keele v. Atchison T. & S. F. Ry. Co.*, 258 Mo. 112, 167 S.W. 433 (Mo. 1914); and *Farris v. Thompson*, 168 S.W.2d 439 (Mo. App. 1943).

But, when the plaintiff is oblivious, it has been said that the zone of immediate danger of being injured is widened to that point where it was or should have been reasonably apparent to the defendant in the exercise of the required degree of care that the plaintiff was oblivious of the approach of defendant's moving vehicle and was intent on continuing across its path. [Cites omitted].

*Todd v. Presley*, 413 S.W.2d 173, 177 (Mo. 1967). Accord, *State ex rel. Thompson v. Shain*, 349 Mo. 27, 159 S.W.2d 582 (Mo. banc 1941); *Lang v. St. Louis-San Francisco Railway Company*, 364 Mo. 1147, 273 S.W.2d 270 (Mo. 1954).

The cases cited by appellant to support its contention that a submissible case on this

point was not made are distinguishable on the facts. In *Turbett, supra*, plaintiff was not oblivious to the approach of the train. In *Keele, supra*, obliviousness was not in issue or sufficiently manifested. In *Palmer v. St. Louis & S. F. R. Co.*, 142 Mo.App. 440, 127 S.W. 97 (Mo. App. 1910) and *Kenefick v. Terminal R. Ass'n of St. Louis*, 207 S.W.2d 294 (Mo. 1948) there was no evidence of obliviousness.

Appellant argues unsuccessfully that decedent's zone of peril was not enlarged by her obliviousness in the face of hard evidence that Mrs. Wiseman completely disregarded the approaching train as she crossed the tracks.

Witness Joyce McCarty testified she first saw Mrs. Wiseman when she was over 40 feet from the collision. Mrs. McCarty continued to watch Mrs. Wiseman until the engine struck her. According to Mrs. McCarty, Mrs. Wiseman seemed to be walking with her head down. Her speed never varied until the instant of the accident. Stanley McCarty testified that when he saw Mrs. Wiseman some 40 feet from the collision he said to himself, "look out lady, there is a train coming." Mr. McCarty characterized Mrs. Wiseman as walking "like she had something on her mind or just had someplace to go or something." Witness Shirley Drennen stated Mrs. Wiseman walked all the way across the tracks "at a steady rate with her head down." Witness Mary Coleman watched Mrs. Wiseman walk at a steady, normal pace toward the path of the train; Mrs. Wiseman "[r]eally not even noticing it." Coleman said to herself while watching, "Oh, my God, either hurry up or something."

From the testimony of eyewitnesses to the accident who observed Mrs. Wiseman as she crossed the tracks, the jury could have found that Mrs. Wiseman was oblivious and in a position of peril when she was as far as 40 feet from the point of collision.

Having determined that Mrs. Wiseman entered a position of immediate danger 40 feet from the point of collision, the second element of a humanitarian cause of action must be examined: that the defendant knew or should have been aware of the plaintiff's position of peril. " 'Whether and when one becomes chargeable with notice that another is in a position of imminent peril depends upon the *reasonable appearances* of the situation confronting him.' *Lane v. Wilson*, 390 S.W.2d 943, 947 (Mo. App. 1965)." *Epple, supra*, 541.

That appellant's head brakeman was on notice that Mrs. Wiseman was in a position of imminent peril is positively established by his statement, "Oh, my God, she's not going to stop," made when Mrs. Wiseman was 12½ feet from the collision. Moreover, the jury could have believed that had head brakeman Storey kept a lookout for Mrs. Wiseman before he saw her 12½ feet from the collision it would have been *reasonably apparent* to him that Mrs. Wiseman was in peril. In fact, relying on the testimony of Mr. and Mrs. McCarty and Shirley Drennen, the jury could have found that Mrs. Wiseman's peril should have been reasonably apparent to Storey the first time he looked at her, when she was 40 feet away. There was substantial evidence to support a finding of obliviousness, and hence immediate danger, at the 40 foot distance. Brakeman Storey, at that time, should have been aware of decedent's position of immediate danger.

*Appellant's Present Ability to Avert Injury and Failure to Exercise Requisite Care*

Next, it must be decided whether respondents produced sufficient evidence to show that once appellant was placed on notice that Mrs. Wiseman was in a position of immediate danger, appellant's employees had the present ability, with the means at hand, to avert the impending injury without injury to themselves or others and that appellant failed to exercise the requisite care to avert the accident. *Epple, supra*, 540–542.

Could appellant have avoided the accident by slackening the speed of the train once Mrs. Wiseman entered into a position of immediate danger? Considering the evidence in the light most favorable to respon-

dents and giving them the benefit of all favorable inferences from that evidence, respondents made a submissible case on failure to slacken speed.

The locomotive is ten feet wide. According to witness Mary Coleman, Mrs. Wiseman was in the center of the track when struck. This is consistent with the position of Mrs. Wiseman's body after the collision. Therefore, Mrs. Wiseman needed to walk another five feet, half the width of the locomotive, to escape. The trial court took judicial notice that the average person walks from two to three miles per hour, or from 2.9 to 4.4 feet per second. Mrs. Wiseman needed an additional 1.1 seconds to pass safely in front of the locomotive.

Neither side produced expert testimony or test results on how far it would take a diesel locomotive pulling six empty hopper cars and a caboose to stop under these track conditions although respondents' brief contained a theoretical calculation of a stopping distance which was attacked as not credible by appellant and which need not be considered here. There was, however, substantial evidence to support a stopping distance of from 124 to 134 feet. There was testimony that the train stopped approximately 124 to 134 feet past the point of impact and that the brakes were applied while the engine was on the crossing. Mary Coleman said she heard the brakes applied at the point of impact and not before. Stanley McCarty testified he did not hear the squealing of the brakes until after decedent was hit. Shirley Drennen first heard the "screeching" when "the train had hit the crossing where the cars cross." Trainman Welch said the front of the diesel was 90 to 100 feet north of the north line of Miller Street when the train stopped. Trainman Adams estimated the distance at 100 feet.

Assuming the brakes were applied at the point of impact, the stopping distance was 124 to 134 feet. [3 feet (one-half the width of the sidewalk) plus 31 feet (the width of Miller Street) plus 90 to 100 feet (estimates of trainmen Welch and Adams)]. If the brakes were applied while the engine was

actually on the crossing, the stopping distance was shorter. As the court stated in *Lang, supra,* at 275, "[T]here is no more cogent, probative evidence of what could and should have been done than what as a matter of indisputable fact was done."

Did appellant exercise the requisite care to avert the impending injury?

[T]he duty of the one in charge of an instrumentality about to inflict injury upon another [is] to stop the same or slacken its speed within the shortest time and space possible consistent with the means at hand and the safety of those aboard, after he becomes chargeable with actual or constructive notice of the perilous situation of the person about to be injured. *Larkin v. Wells, supra* [278 S.W. 1087 (Mo. App. 1925)].

*Hinds v. Chicago, B & Q R. Co.,* 85 S.W.2d 165, 171 (Mo. App. 1935).

There was ample evidence that decedent was in a position of immediate danger before brakeman Storey saw her 12½ feet from the point of impact and made his exclamation. Not one, but several witnesses testified she was oblivious as far as 40 feet from the point of impact. The determination of when a plaintiff has entered a position of immediate danger depends upon the evidence in each case and is a question for the jury provided there is sufficient evidence from which the jury can make a determination. *Yarrington v. Lininger,* 327 S.W.2d 104, 109 (Mo. 1959); *Epple, supra,* 540.

Considering the testimony of the four witnesses that Mrs. Wiseman, as she walked across the tracks, appeared to have something on her mind and to be oblivious of the approaching train, the jury could have found that the head brakeman should have been aware of Mrs. Wiseman's obliviousness and position of immediate danger when she was 40 feet from the point of collision.

In 9.1 seconds Mrs. Wiseman, walking at a rate of three miles per hour, would have walked the 40 feet. Therefore, the engineer and brakeman had 9.1 seconds from the time Mrs. Wiseman was 40 feet from disaster in which to apply the emergency

brake and slow the train before it would strike Mrs. Wiseman. The train was traveling at eight to ten miles per hour. At eight miles per hour the engine was approximately 106 feet from the point of impact when Mrs. Wiseman was 40 feet away (11.7 feet per second times 9.1 seconds). In 10.2 seconds, Mrs. Wiseman, at the rate of three miles per hour, would have walked the extra five feet required for her to reach safety. An additional 1.1 seconds would have allowed her to escape.

In slowing the train as it approached the DeSoto depot (which is approximately 2,000 feet north of the Miller Street crossing), the engineer made what is known as a "service application" of the brakes thus forcing the brake shoes into direct contact with the wheels. Under these circumstances, stopping would have begun instantaneously with the application of the emergency brake. If the brake shoes had not been in contact with the wheels, there would have been, according to engineer Rohlfing, a time lag of "two seconds or better" between the time the emergency brake application was made and the time the brake shoes actually came in contact with the wheels.

Therefore, if brakeman Storey had "big holed" the train when he first saw Mrs. Wiseman (and should have been aware of her immediate danger) he would have had ample time to reduce the speed of the train sufficiently to allow Mrs. Wiseman to cross the tracks ahead of the engine. Allowing for a reaction time of .75 seconds, maximum braking action would have begun 8.35 seconds before the front of the engine reached the point of impact. From this evidence, the jury could reasonably draw the inference that the speed of the train could and should have been slackened enough to allow Mrs. Wiseman to walk the last five feet over the siding track in safety.

It is doubtful that juries engage in such esoteric calculations as to speeds and distances in reaching verdicts on humanitarian cases. But the evidence was there, and in determining submissibility that evidence must be considered if it supports the jury's verdict.

A case very similar on the facts is *Lang, supra.* There the pedestrian was found to be oblivious and in a position of immediate danger 42 feet from the impact with the train. No attempt was made to slacken the speed of the train. The evidence produced as to stopping distances was rejected as lacking a convincing foundation. The court, however, stated at page 275 that "the length of time and the distances in which the plaintiff was in peril are inferable and demonstrable from the circumstances" without the stopping distance testimony. The opinion then analyzes the distance in which the train actually stopped and indicates they could use the evidence of the plaintiff's position of peril and the actual stopping distance to find that the speed of the train could have been slackened enough to allow plaintiff to walk to safety. The judgment for the plaintiff was affirmed. Further support for this result is found in other "almost escaping" cases.

The essence of an "almost escaping" case, such as the case at bar, is the fact that plaintiff (or decedent) needed only a second to emerge from the position of immediate danger, and if the defendant had taken the slightest action to avoid the collision, then no injury would have occurred. *Epple, supra,* 542. "In establishing an 'almost escaping' case the plaintiff must produce evidence, direct or circumstantial, that in the time and space available, the defendant's speed or movement could have been sufficiently altered to enable the plaintiff's escape. [Cites omitted]." *Epple, supra,* 542.

In *Smith v. Thompson,* 346 Mo. 502, 142 S.W.2d 70 (Mo. 1940), a truck moving across a railroad crossing would have been out of danger from being struck by a train (which at its sustained speed was ten or eleven seconds away) in *a little more than one second.* The court said, at page 74: "If all this is true, no further testimony was necessary to raise a warrantable inference that the enginemen could have checked its speed sufficiently to have avoided the collision."

In *Burns v. Maxwell,* 418 S.W.2d 138 (Mo. 1967), the defendant was driving at 30 miles per hour. He had approximately three

seconds (or about 132 feet) to slacken his speed after it should have been reasonably apparent to him that the plaintiff would drive into his path. After subtracting .75 seconds for reaction time, the court found he still had 100 feet in which to reduce his speed and delay reaching the point of collision by the .50 seconds plaintiff needed to pass uninjured. Through this analysis, the court avoided the need for evidence of the precise distance in which the defendant would have had to stop. By showing first, that only a very short time or distance was needed to escape, and, second, that defendant had some time in which to slacken his speed, the court can let ' " 'the facts speak for themselves without the aid of expert evidence, as where the evidence shows that the plaintiff's vehicle had but barely failed to get in the clear before the occurrence of the collision, so that only the least additional time would have enabled the plaintiff to make his escape.' (Citing cases)." ' *Burns, supra,* 141 citing *Schmittzehe v. City of Cape Girardeau,* 327 S.W.2d 918, 924 (Mo. 1959). See, *Woods v. Kurn,* 183 S.W.2d 852, 856 (Mo. App. 1944).

There was substantial evidence to support the jury's finding that appellant's train crew did not act as quickly as possible to avert the tragedy. In this connection, the supreme court's statement in *Chawkley v. Wabash Ry. Co.,* 317 Mo. 782, 297 S.W. 20, 24 (Mo. banc 1927), is appropriate: "It must be remembered that men in charge of railway trains are trained to quick observation and quick action. They do not have to stop and think of the thing to be done. Action follows the impression, automatic and instantaneous; otherwise, they could not hold their jobs." The train could have been slowed sufficiently after Mrs. Wiseman was observed to allow her time to walk the final five feet to safety. Instead, precious time was squandered in commentary and inaction. Defendant failed in its duty to exercise the requisite care to avoid the injury.

Appellant raises no issue as to the fifth element of a humanitarian submission, the injury to decedent as a result of appellant's failure to exercise the requisite care. Therefore, having established the constitu-

ent elements of a humanitarian submission, respondents were entitled to have the issue submitted to the jury.

The trial court did not err in refusing to grant appellant's motion for a directed verdict; it cannot be said that all of the evidence and reasonable inferences to be drawn therefrom were so strongly against respondents that there was no room for reasonable minds to differ. *Moore, supra.*

## IMPEACHMENT

■ Appellant argues strenuously that Storey's testimony on the two to three second time lag was inadmissible because it emerged as a result of respondents' "impeaching" Storey, who was called as their witness.

Storey had testified on deposition that there was a two to three second lag between his exclamation that Mrs. Wiseman was not going to stop and the application of the brakes by the engineer. At trial he denied the deposition testimony as to the time lag and counsel for respondents used Storey's deposition to elicit from him that he had meant to say "*approximately* 2 to 3 seconds" on deposition. Appellant claims the use of the deposition was impeachment. Respondents argue that counsel was merely refreshing the witness' memory.

'[T]o warrant the impeachment of one's own witness, there must always exist the element of actual, and not mere feigned, surprise at the testimony which the witness gives, and even then only in the event that the testimony is of such an affirmative character as to be favorable to the adverse party, and therefore prejudicial to the party who has been misled or entrapped into calling the witness.'

*Crabtree v. Kurn,* 351 Mo. 628, 173 S.W.2d 851, 859 (Mo. 1943), quoting *Woelfle v. Connecticut Mut. Life Ins. Co.,* 234 Mo.App. 135, 147, 148, 112 S.W.2d 865, 872 (Mo. App. 1938).

The court in *Crabtree* continued, at page 859:

[11, 12] Under this rule one may not impeach the witness he has called when

he well knows in advance that the witness' evidence is going to be unfavorable and adverse, as, for example, when the witness' deposition has been previously taken and his evidence was then adverse to the party calling him. . . . When, however, a party is unexpectedly surprised by unfavorable, adverse evidence given by his own witness, he may interrogate such witness as to previous inconsistent statements made by him and introduce testimony of other witnesses showing the previous inconsistent and contradictory statements. [Cites omitted].

The testimony on the two to three second lapse after Mrs. Wiseman was 12½ feet from being struck by the train was not crucial to respondents' making a submissible case on failure to slacken speed. Even without this evidence, respondents showed appellant failed to exercise the requisite care to avert the impending injury. As noted above, the jury could have found that decedent was oblivious 40 feet from the point of impact and that Storey should have been aware of her obliviousness, thus allowing additional time for slowing the train.

Storey's testimony in his deposition, however, established that two to three seconds had elapsed. To say that a change in his testimony at trial was not an unexpected surprise or was not of such an affirmative character as to be favorable to appellant is to ignore the facts of the case and respondents' theory of their cause of action. Appellant argues respondents should have formally announced to the court that they were surprised and, that in the absence of such an announcement, impeachment was improper. While that may have been the wiser course, appellant cites no case or rule of procedure requiring such an announcement. In the context of the examination of this witness, it was clear what respondents were trying to do and why they were doing so. The surprise was actual and obvious and impeachment was proper.

Further, the use of Storey's deposition for the purpose of impeachment was proper. Rule 57.07(a)(1) states: "Any deposition may be used by any party for the purpose of contradicting or impeaching the testimony of deponent as a witness."

Our Rule 57.07(a)(1) is identical to Rule 32(a)(1) of the Federal Rules of Civil Procedure. In commentary on this rule, it is stated in Moore's Federal Practice, Vol. 4A, Paragraph 32.03:

Rule 32(a)(1) permits a party to use any deposition, whether of a party or other person, for the purpose of 'contradicting or impeaching the testimony of the deponent as a witness,' *irrespective of whether the witness is the party's own witness or the witness of some other party.* This slight relaxation of the rule against impeaching one's own witness is in accord with the best modern authorities on that subject. [Emphasis added].

See *Cunningham v. Gans*, 507 F.2d 496 (2nd Cir. 1974).

Wright and Miller, Federal Practice and Procedure, Vol. 8, § 2144, add that "[t]he rule permits a party to use a deposition to impeach his own witness to the extent that the rules of evidence allow such impeachment." Considering the facts here and the cited authorities, the use of Storey's deposition for the purpose of impeachment was proper.

## DEFINITION OF NEGLIGENCE

■ Appellant next contends the trial court erred in failing to define the terms "negligence," "negligent" and "negligently" as used in respondents' verdict-directing instruction, MAI 17.15 (modified).

The case was tried before the effective date of the recent revisions and additions to MAI Civil, which now mandate an instruction defining negligence. This revision solves a recurring problem, but is not applicable here. This same issue was raised in *Epple, supra,* at page 544. The court there refused to express an opinion as to whether the trial court's failure to define negligence constituted prejudicial error, but they did cite *Carter v. Consolidated Cabs, Inc.,* 490 S.W.2d 39 (Mo. 1973). The trial court in *Carter* failed to define negligence after giv-

ing MAI 17.14 (modified). The supreme court rejected the appellant's contention that the failure was reversible error, stating, at page 43:

> If defendants felt the submitted negligence needed further definition, they were free to offer the appropriate MAI definition but declined or failed so to do. In such circumstances the omission of an instruction defining negligence certainly was not a misdirection and does not constitute reversible error. *Robinett v. Kansas City P & L Co.*, supra, [484 S.W.2d 506 (Mo. App. 1972)] l.c. 510[3, 4].

Appellant here was free to offer MAI 11.02 and failed to do so. The trial court's failure to define the negligence terms is not reversible error.

The cases cited by appellant, *Brewer v. Swift & Company*, 451 S.W.2d 131 (Mo. banc 1970) and *Helfrick v. Taylor*, 440 S.W.2d 940 (Mo. 1969), contain language indicating the desirability of an instruction defining negligence. There is dictum in *Helfrick* stating the submission of such an instruction is mandatory. However, *Carter, supra*, is a more recent authority and supports the holding that the omission of an instruction defining negligence is not error in this case.

## AGGRAVATING CIRCUMSTANCES

Consistent with the amended pleadings, respondent's counsel, in his opening and closing arguments, told the jury they could consider "aggravating circumstances" surrounding the death of Mrs. Wiseman in computing respondents' damages should appellant be found liable. Appellant made timely objections on both occasions. In its instruction on measure of damages, the trial court informed the jury that "[i]n assessing the damages you may also take into consideration aggravating circumstances attendant upon the fatal injury."

Appellant contends that in allowing this argument over its objection, and in giving this instruction, the trial court committed reversible error because there was no evidence to support jury consideration of aggravating circumstances. This argument must be rejected.

Section 537.090, RSMo Cum. Supp. 1975, of the Wrongful Death Act states, "The mitigating or aggravating circumstances attending the death may be considered by the trier of the facts." Damage Instructions MAI 5.05 (death of wife) and 5.09 (death of parent) authorize the consideration of "any aggravating circumstances attendant upon the fatal injury" when the evidence supports the submission.

■ At the outset, it should be noted that a humanitarian negligence submission and an instruction on aggravating circumstances are not mutually exclusive. See, *Grothe, supra*; *Spalding v. Robertson*, 357 Mo. 37, 206 S.W.2d 517 (Mo. 1947); *Adams v. Thompson*, 178 S.W.2d 779 (Mo. App. 1944) and cases cited therein.

On the nature and availability of damages for aggravated circumstances, it has been said:

> Now to whatever extent the damages are increased by reason of aggravating circumstances attending the death of the deceased, such increase is punitive in its nature; and therefore to constitute evidence of a character to warrant the submission of the issue of aggravating circumstances there must be a showing of willful misconduct, wantonness, recklessness, or a want of care indicative of indifference to consequences. . . . [I]f [the evidence] shows that the negligence of the defendant or his agent was attended and accompanied by such circumstances as to evince a reckless disregard of the rights of others, then the jury have the right under the statute to take such aggravating circumstances into consideration in determining the amount to be allowed the plaintiff or plaintiffs, and an instruction so informing them is consequently proper. [Cites omitted].

*Williams v. Excavating & Foundation Co.*, 230 Mo.App. 973, 93 S.W.2d 123, 127 (1936).

■ What evidence "of willful misconduct, wantonness, recklessness, or want of care indicative of indifference to consequences" is present in the case at bar?

Directly behind, and to the right of the head brakeman's chair is an emergency brake valve. This brake valve has the same braking effect as the engineer's emergency brake valve. Both can be "big holed" to put the train in an emergency stop. Head brakeman Storey testified he knew where the brake valve was, could reach it from his chair without rising, and had been instructed to use it in a "dire emergency," including when the train was "about to hit something." Yet, Storey also testified that in the seven years and four months prior to the accident, he had received no instruction on how to use the emergency brake, had never used it, and had never been on a train where it had been used to "big hole" a train. At the time of the trial he still did not know which way to push or pull the lever to activate the emergency brake.

In addition, appellant knew that when the locomotive was operated "backwards" the engineer could not see traffic and pedestrians approaching a crossing from his right. Appellant knew in such a situation that action by the head brakeman might be the quickest or only way to avert an accident. Yet appellant failed to provide Storey training on the use of the emergency brake valve and proceeded to operate the train across a very dangerous crossing with a head brakeman who did not know which way to move the lever for an emergency stop.

In *Grothe, supra*, a wrongful death action submitted on humanitarian negligence, evidence that the defendant permitted a busy crossing to be guarded by only a bell which could not be heard except under optimum conditions, and that the community had made written requests for crossing improvements, was found admissible and held sufficient to justify an aggravating circumstances instruction. It would appear, therefore, that antecedent negligence may be considered on the issue of damages.

Even more important, brakeman Storey saw Mrs. Wiseman 40 feet from the collision point in a position of immediate danger, which he should have recognized. Instead of continuing to observe her, however, as the circumstances required, Storey looked away until she was only 12½ feet from being struck, too late for effective action to avoid the accident. His conduct in looking away after he saw her in a position of recognizable immediate danger evinced a reckless disregard for Mrs. Wiseman's safety and was an aggravating circumstance which could be taken into consideration by the jury in determining damages. *Williams, supra.*[1]

Trains are extremely dangerous instrumentalities, particularly at grade crossings in heavily populated areas. Both engineer Rohlfing and brakeman Storey knew the Miller Street crossing was a dangerous one and that cars and people crossed against the signals. Rohlfing said, "you've got to expect anything to happen" at the crossing. Storey testified cars make "last minute dashes" across all the time. Under these circumstances, and considering the engineer's inability to see anything on the brakeman's side, evidence of appellant's past omissions in training Storey, which omissions adversely affected appellant's present ability to protect Mrs. Wiseman's safety, along with Storey's inattention to and disregard for Mrs. Wiseman's immediate danger when he first saw her, were evidence of "a want of care indicative of indifference to consequences" and justified the submission of the "aggravating circumstances" portion of the measure of damages instruction.

Appellant's final assignment of error in support of a new trial—that the trial court erred in admitting evidence on the positioning of the locomotive and on Storey's training—has been sufficiently discussed to show the evidence was relevant to the issue of aggravating circumstances in the computa-

---

1. For additional cases relating to aggravating circumstances see: *Hertz v. McDowell*, 358 Mo. 383, 214 S.W.2d 546 (Mo. banc 1948); *Mudd v. Quinn*, 462 S.W.2d 757 (Mo. 1971); *Tripp v. Choate*, 415 S.W.2d 808 (Mo. 1967); *May v. Bradford*, 369 S.W.2d 225 (Mo. 1963); *Cox v. Terminal R. Ass'n*, 331 Mo. 910, 55 S.W.2d 685 (Mo. 1932); *Reel v. Consolidated Inv. Co.*, 236 S.W. 43 (Mo. 1921); *Dougherty v. Smith*, 480 S.W.2d 519 (Mo. App. 1972).

tion of damages. No error was committed by its admission.

The judgment is affirmed

DOWD, P. J., and ALDEN A. STOCK-ARD, Special Judge, concur.